<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

———————————————————————   :
                                          :
**IN RE CAMBREX CORP.**            :         **03-CV-4896 (WJM)**
**SECURITIES LITIGATION**          :
                                          :
———————————————————————   :
**This Document Relates To: All Actions**  :         **OPINION**
———————————————————————

Peter S. Pearlman
Barry A. Knopf
Cohn, Liflan, Pearlman
 Herrmann & Knopf LLP
Park 80 Plaza West-One
Saddle Brook, NJ 07663
*Attorneys for Plaintiffs*

Alan E. Kraus
Latham & Watkins LLP
One Newark Center
Newark, NJ 07101
*Attorney for Defendants*

**MARTINI, U.S.D.J.:**

Plaintiffs have filed this consolidated class action complaint against defendants Cambrex Corp., James A. Mack, Douglas H. MacMillan, Claes Glassell, Salvatore J. Guccione, and Luke M. Beshar for violations of Section 10(b) and Rule 10(b)(5) (hereinafter collectively "Section 10(b)"), and Section 20(a) of the Securities and Exhange Act of 1934.  *See* 15 U.S.C. §§ 78j(b) and 78t(a).  Defendants have filed this motion to dismiss arguing plaintiffs have failed to adequately plead securities fraud with the required particularity.  For the reasons set forth below, this motion is **GRANTED IN PART** and **DENIED IN PART**.

Plaintiffs allege two schemes of fraudulent activity: (1) the overstatement of financial results for the period of 1997 to 2001, and (2) the failure to disclose and account for the loss of Cambrex's largest contract.  (Am. Comp.  ¶¶ 3, 7) (hereinafter "Compl.").  Plaintiffs essentially argue that defendants engaged in this fraudulent behavior to artificially inflate the price of Cambrex securities so they could profit from insider trading.  (*Id.* at ¶ 10).  Plaintiffs assert that defendants' wrongful behavior harmed purchasers and acquirers of Cambrex securities during the class period.  (*Id.*).

As to the overstatement of financial results, plaintiffs maintain that defendants engaged in a scheme to mislead investors about the company's financial condition by reporting financial results that were overstated by approximately $5 million for the period of 1997 to 2001.  (*Id.* at ¶ 3).  The company announced on January 23, 2003 that it had to correct the previous financial results for this period because it had failed to account for expenses paid by one division on behalf of another, which had resulted in the decline of the stock price from $25.73 to $23.89.  (*Id.* at ¶ 6).  According to an accountant who worked for Cambrex, there was no system in place to ensure these expenses were accounted for, thus net incomes were improperly inflated.  (*Id.* at ¶ 4).  This same accountant claims that Cambrex became aware of this problem as early as 1997 when the company took a write-off to correct the very same problem.  He also states that while he was employed by Cambrex he was told that every Chief Financial Officer ("CFO") after 1997 was told of the problem, but chose not to correct it.  He further asserts that Cambrex corrected its prior misstatements in January 2003 because its auditor, PricewaterhouseCoopers, LLP, insisted Cambrex restate its prior financials.  (*Id.* at ¶ 5).

2

Around the same time defendants disclosed the overstatement, defendants were informed that the United States Food and Drug Administration (hereinafter "FDA") rejected the drug application for Replagal, which resulted in the loss of Cambrex's largest contract with Transkaryotic Therapies, Inc. (hereinafter "TKT") for the manufacturing of that drug. (*Id.* at ¶ 7). Plaintiffs allege that defendants knew about this loss as early as October 2002 and issued forecasts that were materially false and misleading because they failed to adequately or timely account for the loss of the contract. Plaintiffs further allege that on or about January 14, 2003, defendants knew for certain that Cambrex had lost the TKT contract; yet, defendants failed to revise its earnings and revenues to account for the loss of this contract until April 3, 2003. (*Id.* at ¶ 8).

Plaintiffs refer to various statements made in press releases and conference calls where defendants assert an unreasonable earnings growth. In conjunction with the disclosure of the accounting errors, defendants, in the same press release on January 23, 2003, called for earnings growth in the Biosciences segment of 10-15%. (*Id.* at ¶ 73). Defendants then decreased its earnings forecast on April 3, 2003 to 0-5%. (*Id.* at ¶ 81). The drop in the earnings forecast on April 3, 2003 caused a 37% drop in the stock price. (*Id.* at ¶ 8). In a press release issued on April 24, 2003 and during a conference call held on July 9, 2003, defendants maintained the same growth as stated in the April 3, 2003 press release. (*Id.* at ¶¶ 87, 94). On July 24, 2003, defendants again reduced the earnings forecast in the Biosciences segment to 0-3% and attributed the decline to the loss of the TKT contract. (*Id.* at ¶ 96). The very next day, during a conference call, defendant Beshar conceded that the loss of the TKT contract was known when the earlier forecasts were made, but it has taken longer than expected to replace the contract. (*Id.* at ¶ 99).

The market immediately reacted to this statement and the stock price dropped 20% from the previous day's close.  (*Id.* at ¶ 9).  Plaintiffs maintain that defendants knew it had lost the TKT contract but withheld this information and misstated projected growth in the Biosciences segment in order inflate the stock price so as to allow the individual defendants to engage in insider trading of Cambrex securities and realize a profit of over $16 million.  (*Id.* at ¶ 10).

## I.  Standard of Review

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must set forth sufficient information to outline the elements of its claims or to permit inferences to be drawn that these elements exist.  *See* Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957).  A court may dismiss a complaint for failure to state a claim only if, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted under any set of facts which could prove consistent with the allegations.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Zynn v. O'Donnell*, 688 F.2d 940, 941 (3d Cir. 1982).  In deciding such a motion, a court must take as true and view in the light most favorable to a plaintiff all allegations in the complaint.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).  A court need not, however, accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

## II.  Discussion

In order to state a valid Section 10(b) claim, plaintiffs must establish that defendants "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading" in connection with the purchase or sale of a security.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).  The plaintiffs must also establish that defendants acted with the required scienter, and that plaintiffs' reliance on the misstatement caused injury.  *Id.*  Finally, a Section 10(b) claim must satisfy the heightened pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 (hereinafter "PSLRA").  *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 298-99 (D.N.J. 2001).

Rule 9(b) requires that all averments of fraud be stated with particularity.  Fed. R. Civ. P. 9(b); *see also In re Burlington,* 114 F.3d at 1417.  In an attempt "to 'curtail the filing of abusive lawsuits' through the establishment of a 'uniform and stringent pleading requirement,'" *id*. at 299, the PSLRA also imposes a particularity requirement by demanding that the complaint set forth "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  The PSLRA further requires plaintiffs to allege with particularity facts that give rise to a strong inference of scienter with the required state of mind for each act or omission.  *See* 15 U.S.C. § 78u-4(b)(2).  Although Rule 9(b) allows state of mind to be generally averred, the Third Circuit has concluded that the PSLRA supercedes Rule 9(b) in the event of a conflict.  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 n.5 (3d Cir. 1999).

Defendants contend that plaintiffs have failed to comply with the requirements of both Rule 9(b) and the PSLRA.  Defendants make six arguments in support of their motion to dismiss: (1) lead plaintiff Massachusetts Laborers Annuity Fund (hereinafter "MLAF") lacks standing to assert the TKT allegations; (2) various statements alleged in the complaint are inactionable; (3) plaintiffs fail to plead an actionable omission based on the TKT contract; (4) scienter was not sufficiently pleaded; (5) individual defendants cannot be liable under Section 10(b) for statements made by others; and (6) the complaint fails to adequately plead a Section 20(a) claim against the individual defendants.

### A.      MLAF Lacks Standing to Assert TKT Claim

Defendants initially contend that the lead plaintiff MLAF did not purchase stock after July 2002, and thus does not have standing to bring the TKT cause of action because it arises from events spanning from January through April 2003.  The Third Circuit requires that named plaintiffs show that they personally have been injured.  *Carducci v. Aetna U.S. Healthcare*, 247 F. Supp. 2d 596, 623 (D.N.J. 2003) (citing *Klein v. Gen'l Nutrition Cos.*, 186 F.3d 338, 345 (3d Cir. 1999)).  However, "a party named 'lead plaintiff' under the PSLRA need not have standing to sue on each individual claim asserted in the complaint so long as other named plaintiffs have standing to pursue the claims at issue."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 257 (S.D.N.Y. 2004).

Because MLAF did not purchase stock after July 2002, it is apparent that MLAF was not injured as a result of the alleged TKT fraud, which could not have occurred earlier than October 2002.  However, Stephen Dodge, another named plaintiff, purchased 200 shares of Cambrex

6

stock in April 2003.  (Compl. ¶ 16).  Therefore, *a named* plaintiff does have standing to assert

this claim, and the TKT claim will not be dismissed for lack of standing.


**B.      Inactionable Statements**

Defendants challenge many of the allegations made by plaintiffs in their complaint on the

bases that they are not alleged to be false, are inactionable statements of corporate optimism, or

are forward-looking statements that are protected by the safe harbor provision of the PSLRA and

the bespeaks caution doctrine.  (Defs.' Br. at 29).  Defendants also argue that plaintiffs have not

stated an actionable claim of omission as to the TKT contract, which will also be addressed in

this section.  (*Id.* at 34).


**1.      Statements Not Alleged to be False**

Defendants list numerous paragraphs (¶¶ 67, 69, 73-75, 78, 83, 86, 89) containing

excerpts from press releases and conference calls which they claim are never alleged to be false

and thus do not meet the pleading requirements.  (Defs.' Br. at 30; *see also* Defs.' Br., App. A).

Defendants also claim that portions of paragraphs 35-63 are not actionable because they are

alleged to be false only in "the most conclusory terms" and are unrelated to the alleged fraud.

(Defs.' Br. at 30).

As already noted, allegations in the complaint which are not alleged to be misleading with

sufficient detail or those not alleged to be misleading at all must be dismissed.  *See In re*

*Advanta*, 180 F.3d at 530-31; 15 U.S.C. § 78u-4(b)(3)(A).  This section is divided into those

disputed paragraphs of the complaint that refer to the accounting fraud, and those that refer to the TKT contract.

### a.     Statements Based on the Alleged Accounting Fraud

In their complaint, plaintiffs list thirty-eight paragraphs under the heading "Materially False and Misleading Statements Issued During the Class Period," and list twenty-two more paragraphs under the heading "The Truth About Cambrex's Improper Accounting Begins to Emerge." (*See* Compl. ¶¶ 35-94). Defendants correctly point out that "[s]imply referring to a series of public statements and then alleging, in a general and conclusory manner, that those disclosures were false or misleading is insufficient." *In re Party City*, 147 F. Supp. 2d at 300 (citations omitted). Although each of the over fifty statements that are alleged to be misleading is not accompanied by a specific explanation, plaintiffs do set forth in their complaint the basis for alleging that the statements are false. (*See* Compl. at ¶¶ 3-6, 64-66).

Plaintiffs allege that Cambrex failed to properly account for certain types of expense accounts that handled payments by one division of the company on behalf of another. (*Id.*). The alleged result of this departure from generally accepted accounting principles ("GAAP") was that net income was improperly reported each quarter from 1997 through 2001, and was overstated by over $5 million for the time period in question. (*Id.*). These errors are confirmed by the fact that Cambrex announced in January 2003 that it was restating $5 million in net income. (*Id.* at ¶ 6). Furthermore, plaintiffs allege that Cambrex was aware of the accounting problems by at least 1997. (*Id.* at ¶¶ 5, 65). Although defendants identify excerpts from various paragraphs in the complaint that do not directly address the alleged accounting fraud, these statements serve as

context for the sections alleged to be false. Accordingly, this Court finds that paragraphs 35 through 63 are adequately alleged to be false or misleading and, therefore, are actionable.

Several paragraphs in the complaint, however, do not allege statements to be false and, therefore, those statements are not actionable. Paragraph 74 is merely an excerpt from a press release correcting a typographical error in the restatement. Plaintiffs have not alleged anywhere in the complaint that this correction is false or misleading. Additionally, paragraphs 83, 86 and 89 concern the SEC inquiry into the accounting misstatements. Paragraphs 83 and 86 are excerpts from defendant Beshar's discussion of Cambrex's cooperation with the SEC's informal investigation into the earnings restatements. Paragraph 89 contains an excerpt where Beshar acknowledges that the investigation had been turned into a formal inquiry. Although the SEC eventually launched a formal investigation, the complaint does not allege that these characterizations of the inquiry were false or misleading at the time they were made. Thus, paragraphs 74, 83, 86 and 89 are not actionable.

### b.    Statements Based on the Loss of the TKT Contract

In addition to the accounting fraud, plaintiffs also allege that the defendants improperly withheld information regarding the loss of a major contract with TKT. (Compl. at ¶¶ 7-9). Under the contract, Cambrex's Biosciences segment manufactured the active ingredient for Replagal, a TKT drug that was awaiting FDA approval. (*Id.*). Plaintiffs claim that defendants knew it was "more likely than not" that the contract would be cancelled as early as October 2002, but knew for certain on or about January 14, 2003, when the FDA rejected TKT's application for Replagal. (*Id.*). Defendants claim that although they were aware of the FDA rejection and

TKT's cancellation, they believed that TKT had started the cancellation process so that it could renegotiate the contract. Because this is a motion to dismiss, and the allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiffs,[1] the Court finds that defendants knew the TKT contract was lost as of January 14, 2003. Due to the lead time required for new contracts, plaintiffs allege that defendants knew that it would be impossible to replace the loss of the TKT contract for fiscal year 2003. Thus, statements made after January 14, 2003, forecasting continued high growth in the Biosciences segment, are properly alleged to be false and/or misleading.

Given that conclusion, paragraphs 73, 75 and 78 are actionable. Paragraph 73 contains a statement targeting double digit growth for the Biosciences segment. Paragraph 75 contains a statement predicting a continued trend of revenue growth in the Biosciences segment. Both of these statements were made after the cancellation of the TKT contract.

Paragraphs 67, 69 and 78 are distinguishable. Although paragraphs 67 and 69 both forecast strong growth in the Biosciences segment, both were made before defendants allegedly became aware of the cancellation of the TKT contract on January 14, 2003, which is evidenced by TKT's continued optimism about the FDA's approval of Replagal. (*See* Compl. ¶ 68). Further, paragraph 78 includes an excerpt from the March 20, 2003 Form 10-K filed by defendants with the SEC. That excerpt explains why Cambrex restated its results for the previous five years. That excerpt is not alleged to be false. Accordingly, because the statements in paragraphs 67, 69 and 78 are not alleged to be false, they are not actionable.

---

[1]*See Warth v. Seldin*, 422 U.S. 490, 501 (1975).

2.      **Statements of Corporate Optimism**

Defendants next argue that several paragraphs in the complaint (¶¶ 37, 41, 43, 45, 49, 52, 58, 60, 62, 69, 90) are simply statements of corporate optimism and are not actionable.  (Defs.' Br. at 30; *see also* Defs.' Br., App. B).  Certain vague and general statements of optimism have been considered inactionable as a matter of law because they "constitute no more than 'puffery' and are understood by reasonable investors as such."  *In re Burlington*, 114 F.3d at 1429 n.14. "Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material."  *In re Advanta*, 180 F.3d at 538.  However, the Supreme Court has held that statements of opinion by top corporate officials may be actionable if they are made without a reasonable basis.  *In re Burlington*, 114 F.3d at 1428 (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098 (1991)).  The reason for this exception is that such statements "can be materially significant to investors because investors know that these top officials have knowledge and expertise far exceeding that of the ordinary investor."  *Id.*

A majority of the excerpts alleged by defendants to be inactionable statements of corporate optimism are the reactions of Cambrex's officers to the company's allegedly fraudulent financial results.  These statements tend to be vague expressions of optimism, noting that officials are "pleased" or "optimistic."  Accordingly, these statements by themselves would not be actionable.  However, each paragraph as a whole contains actionable information on the company's financial results, and the puffery is largely irrelevant.  Paragraphs 37, 41, 43, 45, 49, 52, 58, 60 and 62 are therefore actionable.  To the extent that plaintiffs attempt to rely upon opinions expressed by Cambrex executives, they will not be able to do so successfully. Paragraph 69 has already been found to be inactionable, as it does not allege statements to be

11

false.  Further, assertions in paragraph 90 to the effect that "we're adding new business all the time" are mere statements of corporate optimism.  (*See* Compl. ¶ 90).  In fact, paragraph 90 also contains an accurate assessment of the impact of the loss of the TKT contract, and defendants' hope that the setback would be overcome.  Therefore, paragraph 90 is not actionable.

### 3.    Forward-Looking Statements

Defendants also claim that many of the allegedly fraudulent statements contained in plaintiffs' complaint (¶¶ 39, 41, 45, 47, 49, 51, 52, 54, 56, 58, 60, 62, 67, 73, 75, 81, 87, 89, 90)[2] are protected by both the bespeaks caution doctrine and the safe harbor provision of the PSLRA. (Defs.' Br. at 31-34; *see also* Defs.' Br., App. C).  The two concepts are quite similar, but will be considered separately below.

### a.    Bespeaks Caution Doctrine

Opinions, predictions, and other forward-looking statements are not *per se* inactionable under the securities laws, but may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them.  *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 (3d Cir. 1993) (citations omitted).  However, under the bespeaks caution doctrine, a securities fraud claim may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) if there is sufficient cautionary language to negate the materiality of the alleged misrepresentation.  *Id.* at 371. "'[B]espeaks caution' is essentially shorthand for the well-established principle that a statement

---

[2]For the reasons articulated above, the public statements in paragraphs 67, 89 and 90 are not actionable.

or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." *Id.* at 364.  The application of the doctrine depends on the specific language used in the cautionary statements, thus courts must assess the communication in question on a case-by-case basis.  *Id.* at 372.

A vague or blanket disclaimer merely warning that the investment has risks usually will not suffice.  *Id.* at 371.  Rather, the cautionary statements must be "extensive yet specific," in addition to being "substantive and tailored to the specific future projections, estimates or opinions" in the documents in question.  *Id.* at 369, 371-72.  Moreover, although the Third Circuit has never explicitly held that the cautionary language must accompany the statements in question, it has held that the language must be directly related to the alleged misrepresentations. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 874 (3d Cir. 2000).

### b.    Safe Harbor of the PSLRA

The statutory safe harbor of the PSLRA is based on the judicial bespeaks caution doctrine, and similarly restricts certain forward-looking statements from becoming a basis for securities fraud liability.  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547 (6th Cir. 2001).  The safe harbor provides that there shall be no liability for a forward-looking statement where such statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *In re Party City*, 147 F.Supp. 2d at 309 (quoting 15 U.S.C. § 78u-5(c)(1)(A)(I)) (internal quotations omitted).  Regarding statements made by natural persons, the PSLRA provides that a forward-looking statement is shielded by the safe harbor unless the plaintiff proves it was made

13

with actual knowledge that the statement was false or misleading. *In re Advanta*, 180 F.3d at 535 (quoting 15 U.S.C. § 78u-5(c)(1)(B)(i)).  Forward-looking statements made by business entities are protected by the safe harbor unless they were made by or with the approval of an executive officer of that entity who had actual knowledge that the statement was false or misleading.  15 U.S.C. § 78u-5(c)(1)(B)(ii).  Under the PSLRA, a statement is forward-looking if it contains, *inter alia*, a statement of the plans or objectives of management for future operations, a statement of future economic performance, or a projection of revenues, income, or other financial items. 15 U.S.C. § 78u-5(i)(1).  The PSLRA does not impose a duty on any person to update a forward-looking statement.  *In re Advanta*, 180 F.3d at 536; 15 U.S.C. § 78u-5(d) ("Nothing in this section shall impose upon any person a duty to update a forward-looking statement.").

### c.    Analysis

It is clear that a statement must actually be forward-looking in order to be protected under either the PSLRA's safe harbor or the bespeaks caution doctrine.  Several statements alleged by defendants to be protected are either not forward-looking, or are small, immaterial portions of an otherwise actionable paragraph in the complaint, and therefore protection is not available.  *See, e.g.*, *Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 321 (D.R.I. 2004) (stating "the forward-looking statement protection disclosure is not available for a representation of present fact because the statement is misleading when made").  Accordingly, paragraphs 39, 41, 45, 47, 49, 52, 54, 56, 58, 62 and 73 cannot be considered forward-looking and therefore are not protected by either the PSLRA's safe harbor or the bespeaks caution doctrine.

14

Several other statements can be considered forward-looking, and thus require further analysis to determine whether they are protected by the safe harbor or bespeaks caution doctrine. The threshold issue is whether or not the cautionary statements meet the fairly high standard necessary to protect forward-looking statements under either doctrine. *See, e.g., In re Party City*, 147 F. Supp. 2d at 299. Paragraphs 51 and 60 involve Cambrex's revision of earnings forecasts for the second half of 2000 and 2001, respectively. Although it is unclear whether or not the cautionary language directly accompanied the press releases, it is clear that the language is not meaningful and specific enough to prevent liability based on the statements. Previous applications of the doctrines protecting forward-looking statements have required fairly specific and tailored substantive language, and not merely a boilerplate warning that investments have risks. *See, e.g., In re Donald J. Trump Casino*, 7 F.3d at 371-72. The language in question here warns investors of the "risks and uncertainties that exist" which might cause "results to differ materially from the Company's expectations." (Defs.' Br., App. C at 7-8, 10). The language here is simply too vague to protect earnings estimates that were based on allegedly fraudulent accounting practices. Furthermore, plaintiffs allege that the defendants were aware of the accounting problems that inflated earnings as early as 1997. (Compl. at ¶ 3). Even if the warnings were sufficient, the safe harbor is not available when the forward-looking statements are made by or with the approval of an executive officer of that entity who had actual knowledge that the statement was false or misleading, as is alleged to be the case here. *See* 15 U.S.C. § 78u-5(c)(1)(B)(ii). Accordingly, paragraphs 51 and 60 are actionable.

Likewise, that reasoning applies to the very similar cautionary language applicable to paragraphs 75, 81 and 87. Paragraph 75 deals with revenue forecasts for the remainder of 2003

issued days after the FDA rejected Replagal, but before public disclosure of the TKT contract cancellation.  Paragraphs 81 and 87 deal with earnings forecast restatements issued three months after the cancellation of the TKT contract.  Again, the applicable cautionary language is akin to a boilerplate warning, and is not the kind of meaningful, specific language contemplated by these doctrines.  Accordingly, the high standard required for cautionary language to negate a misrepresentation is not met, and paragraphs 75, 81, and 87 are actionable.


###     4.    Omission

Finally, defendants assert plaintiffs' complaint does not state an actionable omission based on the TKT contract cancellation because the potential loss of the contract and the potential impact on the company's forecasts were not sufficiently certain to create an obligation for disclosure.  (Defs.' Br. at 35).  Defendants claim the possible loss from the contract was not certain since TKT still had a need for Replagal and the companies continued to negotiate the contract.  (*Id.* at 36).  Defendants also assert that even with the loss of the contract, a material impact on Cambrex's earlier earnings guidance was not certain since Cambrex could have signed new contracts.  (*Id.* at 37).

In connection with the purchase or sale of any security, under Section 10(b), there is an obligation to disclose any "material fact necessary to make a statement not misleading."  *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (quoting *In re Burlington*, 114 F.3d at 1417).  To state a claim for relief under Section 10(b), "a plaintiff must plead facts demonstrating that (1) the defendant . . . omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement

16

caused him or her injury." *California Pub. Employees' Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *In re Burlington*, 114 F.3d at 1417). Omissions are considered material if "there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having 'significantly altered the "total mix" of information available to that investor'" and would have been important in making his investment decision. *Oran*, 226 F.3d at 282 (quoting *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996)).

Plaintiffs allege a claim for the omission of material facts that would have altered the "total mix" of information made available. (Compl. ¶ 80). If the effects of losing the TKT contract were uncertain or only "speculative in nature," as the defendant asserts, it would create doubt as to whether or not the reasonable investor would find the information material, as required for a claim under Section 10(b). *See Klein*, 186 F.3d at 343 (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992)). However, at the pleading stage, the Court is required to give credit to plaintiffs' allegations rather than defendants' responses. Plaintiffs allege defendants knew the loss of the contract was definite and this made the earnings guidance impossible to achieve. (Compl. ¶¶ 77, 80). Plaintiffs further argue TKT never intended to renegotiate the contract, as evidenced by the Form 10-K filed with the SEC stating the contract was terminated in January of 2003. (Pls.' Br. at 12-13; Compl. ¶ 79). They also contend that defendants' argument that they could maintain expected earnings for 2003 without the TKT contract is meritless. (Pls.' Br. at 13; Compl. ¶¶ 77, 80). Plaintiffs contend there was no possible way to recoup this loss within the year by signing new contracts, and offer to support this conclusion with statements from defendant Mack stating it takes nine months to receive any revenue after a new contract is signed, and would take approximately twelve months to recover

from the loss of the TKT contract.  (Compl. ¶¶ 75, 90).  Plaintiffs have alleged facts indicating it

was certain Cambrex would not meet their goals.  Thus, defendants' motion to dismiss plaintiffs'

omission claim is denied.


**C.      Failure to Plead Scienter With Particularity**

The Court must next determine whether plaintiffs adequately pleaded scienter in order to

sustain the Section 10(b) claims.  The PSLRA requires that a securities fraud complaint "state

with particularity facts giving rise to a strong inference that the defendant acted with the required

state of mind." 15 U.S.C. § 78u-4(b)(2).  This must be pleaded as to each act or omission.  *GSC*

*Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004).  The strong inference

requirement under the PSLRA supercedes the more relaxed scienter standard under Rule 9(b).

*Id.*  A plaintiff may establish a strong inference of scienter by alleging both motive and

opportunity to commit fraud or alleging conscious misbehavior or recklessness.  *Oran*, 226 F.3d

at 288-89.


**1.      "Must Have Known"**

Plaintiffs assert that as a result of their positions, the individual defendants were privy to

confidential and proprietary information adverse to Cambrex, and thus knew or recklessly

disregarded the fact that adverse information was being concealed from the public.  (Compl. ¶

24).  However, "[g]eneralized imputations of knowledge do not suffice, regardless of the

defendants' positions within the company." *In re Advanta*, 180 F.3d at 539.  Therefore,

18

knowledge cannot be imputed to these individuals merely because they held high positions

within the company.


### 2.       Motive and Opportunity

Plaintiffs also allege that individual defendants engaged in an insider selling campaign,[3]

and thus had motive to artificially inflate the stock price by making misrepresentations. "'Blanket

assertions of motive and opportunity' will not suffice, and 'catch-all allegations that defendants

stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are

no longer sufficient, because they do not state facts with particularity or give rise to a strong

inference of scienter.'" *GSC*, 368 F.3d at 237.  In order to satisfy motive and opportunity,

plaintiffs must allege a personal benefit to the individual defendants resulting from the fraud.  *Id.*

Motive "entail[s] concrete benefits that could be realized by one or more of the false statements

and wrongful nondisclosure alleged."  *In re Nice Sys.*, 135 F. Supp. 2d 551, 583 (D.N.J. 2001)

(quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000)).

Stock sales may support an inference of scienter if they were "unusual in scope or

timing."  *In re Party City*, 147 F. Supp. 2d 282, 312 (D.N.J. 2001).  Fraudulent intent is not

inferred by the mere sale of stock in large part because many corporate executives are

compensated in terms of stock.  In other words, these individuals trade securities in the normal

course of events.  *See In re Burlington*, 114 F.3d at 1424.  Plaintiffs "must allege that the trades

were suspicious enough to support the necessary strong inference of scienter."  *Id.*  Further, it has

been recognized that "causing temporary inflations of price through the dissemination of false

---

[3](*See* Compl. ¶¶ 10, 104).

19

information hurts the long-term stock price of the company and thereby presumably hurts managerial compensation." *Id.* at 1423 n.12.

Plaintiffs allege that four of the five individual defendants engaged in the insider selling campaign during the class period.[4]  This campaign is allegedly supported by the fact that defendants Glassell, MacMillan, Mark and Guccione sold Cambrex securities over several years, earning over $16 million.  The securities sold represented "47.22% of all defendants' holdings." (Compl. ¶ 104).  Plaintiffs allege that these sales provided motive to disseminate materially false and misleading information about the company.  (*Id.* at ¶ 10).

Plaintiffs' allegations, however, fail to establish insider trading with sufficient specificity. The allegations do not demonstrate that the timing of the sales is suspicious.  At most, the allegations merely establish that the sales took place within the class period.  However, the class period is approximately five years long.  Although the defendants sold securities over four of those years, they are not associated with any events that make the timing questionable.  Notably, not one of the four defendants sold stock during the four months prior to the January 23, 2003 restatement, with three of the four defendants not selling any stock during the eleven months preceding the restatement.  "A broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter." *In re Party City*, 147 F. Supp. 2d at 313 (finding sales of stock three, four and twelve months before the disclosure of negative news to be too attenuated to draw an inference of scienter).  Further, it appears many of these transactions came well after the stock had reached its high in 2001.  (*See* Compl. ¶ 104).  Thus, the timing of these

---

[4]Beshar is not alleged to have sold stock during that period.

20

trades raises serious doubt whether the sales were motivated by an intent to capitalize on the disclosure of the restatement and loss of the TKT contract.

Moreover, the allegations concerning the scope of the trading are wanting. Although the allegations show that the individual defendants made over $16 million by selling 47.22% of all defendants' holdings, without context, that simply is not sufficient to demonstrate unusual activity. First, there is no "information as to whether the profits made were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud." *In re Burlington*, 114 F.3d at 1423. Indeed, plaintiffs have not provided any information regarding the defendants' compensation levels, including the amount of stock or stock options provided to them as part of their compensation. Second, there is no information regarding the defendants' trading history before and after the class period. Thus, the Court has no way to determine whether the defendants' sales were normal and routine. *See id.* at 1424 ("A large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events.") (internal citation omitted). Lastly, the only trades that took place in relative temporal proximity to the negative disclosures were made by Glassell on February 4, 2003. (Compl. ¶ 104). These trades accounted for approximately 3.7% of his holdings, and an even smaller percentage of the aggregate holdings at that time. That extremely small percentage of stock sold is insufficient activity from which an inference of scienter can be drawn.

In short, the allegations concerning the individual defendants' stock sales are insufficient and thus unable to support an inference of scienter.

3.       **Conscious Misbehavior and Recklessness**

Plaintiffs also maintain defendants recklessly made misrepresentations regarding

Cambrex's financial results and forecasts for the Biosciences segment.  "A reckless statement is

one 'involving not merely simple, or even inexcusable negligence, but an extreme departure from

the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is

either known to the defendant or is so obvious that the actor must have been aware of it.'" *In re*

*Advanta*, 180 F.3d at 535.  To adequately plead scienter, it is sufficient for plaintiffs to allege that

defendants had knowledge of facts or access to information that contradicts their statements.  *In*

*re Party City*, 147 F. Supp. 2d at 315.  It must be pled with particularity that the defendants knew

the alleged misrepresentations were false when made or that the issuance of the statements were

highly unreasonable.  *Id.* at 317.  A refusal to acknowledge the obvious or to investigate the

doubtful may also give rise to an inference of scienter.  *In re Nice*, 135 F. Supp. 2d at 585.  A

plaintiff, however, cannot rely on factual statements coupled with allegations of fraud in order to

plead scienter.  *Id.*  Finally, reckless behavior should not be defined liberally, otherwise there is a

risk of losing the distinction between scienter and negligence.  *In re Digital Island Sec. Litig.*,

223 F. Supp. 2d 546, 555 (D. Del. 2002).

Plaintiffs allege that defendants had knowledge of the accounting misstatements since

1997.  Thus, as alleged, defendants knew they were misleading the public during this entire

period.  Additionally, plaintiffs allege defendants knew of the loss of the TKT contract and failed

to disclose and account for it when they rendered their 2003 forecasts.

####    a.    Accounting Fraud

Plaintiffs contend that the defendants system for accounting for expenses did not comply with GAAP.  The plaintiffs refer to various press releases and Form 10-K's over a three year period where defendants stated financial results and claim these results were prepared pursuant to GAAP.  (Compl. ¶¶ 35-63).  Notably, "[s]imple computation errors or slight accounting mistakes will not suffice to establish scienter."  *In re IKON Office Solutions Inc.*, 277 F.3d 658, 667 (3d Cir. 2002).  Plaintiffs allege defendants had knowledge of the errors in the financial statements. In support of this assertion, plaintiffs contend that according to an accountant that worked for Cambrex, the company knew of the inaccuracies by 1997 and every CFO had been made aware of the unaccounted for expenses.  (Compl. ¶ 65).  Further, plaintiffs maintain that this accountant personally corrected several inter-company accounts in 2002, where the Biosciences, Profarmco, and BioWhittaker divisions failed to properly account for expenses.  (*Id.* at  ¶ 66).

In order to satisfy the particularity requirement when relying on a confidential source, such as the accountant in this case, plaintiffs must aver when the source was employed by the company, the dates the sources acquired the information, and how the source had access to such information.  *See California Public Employees' Ret. Sys.*, 394 F.3d at 148.  Further, plaintiffs must explicitly state how the source had knowledge of what the individual defendants knew, and whether this knowledge was firsthand.  *Id.*  Specifically, the Third Circuit adopted the standard articulated by the Second Circuit, which states in pertinent part:

> "[P]laintiffs need only plead with particularity *sufficient* facts to support those beliefs.  Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide adequate basis for believing that the defendants' statements were false.  Moreover,

23

> even if personal sources must be identified, there is no requirement
> that they be named, provided they are described in the complaint
> with sufficient particularity to support the probability that a person
> in the position occupied by the source would possess the
> information alleged."

*Id.* at 146 (emphasis in original) (quoting *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000)).

While plaintiffs are not required to specifically provide the name of the individual, they need to

sufficiently provide facts that support the assertion that said source was in a position to possess

such facts. That being said, plaintiffs did explain that their source was an accountant that

corrected the expense accounts for three of Cambrex's divisions. The complaint further states

that:

> According to the accountant, Cambrex was made aware that these
> accounts were inaccurate at least by 1997. In that year, the
> Company took a write-off to correct numerous operating operating
> expenses that had not been recorded due to the exact same failure
> to reconcile inter-company accounts that caused the Company to
> restate in 2003.

(Compl. ¶ 65). The complaint concludes that the accountant was requested to correct expense

accounts in the Fall of 2002, at which time the accounting errors were explained to him. (*Id.* at ¶

64). The complaint goes on to state that "this accountant was told that every CFO at Cambrex

after 1997 had been made aware of the unaccounted-for expenses in the inter-company accounts,

but none of them had corrected the problem." (*Id.* at ¶ 65). Plaintiffs have sufficiently pleaded

defendants' knowledge of the accounting errors through the use of the anonymous source. Thus,

the motion to dismiss as to the accounting misrepresentations is denied.

24

        **b.**    **TKT Contract**

Plaintiffs allege scienter as to the TKT contract by arguing that defendants recklessly issued earnings forecasts that they knew could not be achieved.  (Compl. ¶ 68).  Plaintiffs refer to various forward looking statements made by defendants from January to July 2003, arguing defendants had no reasonable basis to believe these forecasts were accurate since they were informed in January 2003 that Cambrex had lost its largest contract.

Where the alleged misrepresentations are forward-looking statements, plaintiffs must allege defendants had actual knowledge the statements were false or misleading.  *See* 15 U.S.C. § 78u-5(c)(1)(B).  Thus, a plaintiff must not only allege the statements are false, but must also allege why there is no reasonable basis for the forecasts.  *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 597 (D.N.J. 1997).  In satisfying this standard, "plaintiffs bear the burden of 'plead[ing] factual allegations, not hypotheticals, sufficient to reasonably allow the inference' that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology."  *In re Burlington*, 114 F.3d at 1429.

Defendants made various statements regarding the growth of the Biosciences segment throughout the end of 2002 and the beginning of 2003.  While plaintiffs maintain that defendants knew as early as October 2002 that it could not meet these earnings forecasts, this Court has already found these statements inactionable in Section II.B.1.b.  Even if this Court were to find them actionable, plaintiffs did not allege scienter for fraud as early as October 2002.  Although the FDA postponed the approval of Replagal during that time, defendants were not aware of any

25

disapproval by the FDA as TKT issued in an October 2, 2002 press release that it believed the FDA would approve Replagal.  (*Id.* at ¶ 68).

However, plaintiffs have sufficiently pled scienter with regard to the TKT contract for forecasts from January 2003 onward.  There are four main communications at issue here: (1) the January 2003 press release projecting earnings growth at 10-15%, (*id.* at ¶ 73), (2) the April 3, 2003 press release dropping earnings growth in the Biosciences segment to 0-5% as a result of a lost contract (*id.* at ¶ 81), (3) the April 24, 2003 press release reiterating 0-5% earnings growth in Biosciences segment (*id.* at ¶ 87), and (4) the July 9, 2003 conference call stating that the expected earnings growth remained at 0-5% (*id.* at 94).  The complaint alleges that defendants knowingly or recklessly made false earnings forecasts because defendants knew on or about January 14, 2003 that the FDA did not approve Replagal and that TKT was terminating the contract effective July 2003.  (*Id.* at ¶¶ 71, 77, 79).  Plaintiffs contend that defendants' financial guidance was false and misleading because the TKT contract made up 10% of the revenue generated by the entire Biosciences division the previous year and generated $17.5 million in revenue annually.  (*Id.* at ¶ 77).

In support of these allegations, plaintiffs point to TKT's March 31, 2003 Form 10-K, which stated that TKT terminated its contract with the manufacturer of Replagal in January 2003 to be effective July 2003.  (*Id.* at ¶ 79).  In addition, plaintiffs reference defendant Mack's statement during a conference call on January 24, 2003 that "the closing cycle [for projects] has been about nine months, once we validate or certify that it's a worthy project, until the time we have a master production agreement, it takes eight to nine months." (*Id.* ¶ 75).  Plaintiffs also rely on defendant Mack's response to a question during an April 25, 2003 conference call where

26

he stated it would take about twelve months to recover from the TKT loss because that contract was for the manufacturing of a commercial product that annualized about $17 million and the new projects tend to be phase three clinical projects that annualize $2 to $5 million. (*Id.* at ¶ 90). Plaintiffs' allegation that defendants knew they could not meet these earnings projections is supported by the July 24, 2003 press release where defendants attributed the decline in Biosciences sales to the loss of the TKT contract (*id.* at ¶ 96), and the July 25, 2003 conference call where defendant Beshar conceded that the loss of the TKT contract was known during earlier forecasts, but that it just had taken longer than expected to replace the contract (*id.* at ¶ 99). Taking all of these allegations into consideration, this Court concludes that plaintiff adequately pleaded scienter as to the forecasts issued from January 2003 through July 2003 as plaintiffs have alleged facts sufficient to support a conclusion that these forecasts were not founded on a reasonable basis.

Plaintiffs also allege defendants failed to disclose the loss of the TKT contract on its March 20, 2003 Form 10-K, which resulted in a violation of Section 10(b). Again, plaintiffs have sufficiently pleaded scienter. (*See id.* ¶¶ 79-80). "[I]n a non-disclosure situation, any required element of scienter is satisfied where . . . the defendant has actual knowledge of the material information." *GSC*, 368 F.3d at 239. Plaintiffs have alleged that defendants had actual knowledge of the loss of the TKT contract as early as January 14, 2003, which is supported by TKT's Form 10-K issued on March 31, 2003 stating it had cancelled the contract in January 2003. Thus, plaintiffs have alleged sufficient scienter with regard to the TKT omission.

D.     **Liability of Individual Defendants for Others' Statements**

Individual defendants MacMillan, Glassell and Guccione argue they are not liable under

Section 10(b) because plaintiffs have not alleged that they made materially misleading

statements.  Plaintiffs do not dispute that they have not made any allegations as to these

individual defendants, but contend that pursuant to the group-publishing doctrine, individual

defendants can be held liable because corporate public statements are considered the collective

effort of all corporate officers.  (*See* Pls.' Br. at 32-4).

Before the PSLRA was adopted, the Supreme Court made it clear that a defendant cannot

be liable under Section 10(b) for statements not attributed to that defendant.  *Central Bank of*

*Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994).  Section 78u-

4(b)(2) of the PSLRA comports with this holding by requiring that each defendant be alleged to

have made an intentional misstatement or omission.  *See* 15 U.S.C. 78u-4(b)(2).

While the group-publishing doctrine would relieve plaintiffs of having to allege a

misstatement with regard to every defendant where the misstatements are contained in corporate

public statements, it is not clear that this doctrine has survived the adoption of the PSLRA in this

circuit.  Although the Third Circuit has yet to speak on this issue, various districts courts in this

circuit have.  The majority of the district courts have held that the PSLRA abrogates the group-

published information doctrine.  *See, e.g.*, *Winer Family Trust v. Queen,* No. 03-4318, 2004 U.S.

Dist. LEXIS 19244, *17 (E.D. Pa. Sept. 27, 2004); *see also In re Am. Bus. Fin. Servs., Inc.*, No.

04-0265, 2005 WL 1324880, *13 (E.D. Pa. June 2, 2005).  Further, the only circuit to have

spoken on this issue, the Fifth Circuit, reached the same conclusion and found that the PSLRA

has abrogated the group-publishing doctrine.  *Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*,

28

365 F.3d 353, 364 (5th Cir. 2004).  These cases are persuasive.  Therefore, this Court concludes that the group-publishing doctrine has not survived the adoption of the PSLRA, and dismisses the asserted Section 10(b) claims asserted against individual defendants MacMillan, Glassell, and Guccione.

**E.       Failure to Adequately Plead a Section 20(a) Claim**

Lastly, defendants argue that plaintiffs have not adequately pleaded a violation of Section 20(a).  Section 20(a) imposes liability on individuals who control any person liable under any provision of the Securities Exchange Act of 1934.  *See* 15 U.S.C. § 78t(a).  Section 20(a) is a derivative liability section, requiring evidence of a separate violation under the Act.  *In re Advanta*, 180 F.3d at 541.  In order to state a claim under Section 20(a), plaintiffs must plead with particularity: "(1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and (3) that they were 'in some meaningful sense culpable participants in the fraud.'"  *In re Cendant Corp. Sec. Litig.*, 76 F. Supp. 2d 539, 548 (D.N.J. 1999).

Plaintiffs' Section 20(a) claim is based on the underlying violation of Section 10(b).  Defendants initially contend that plaintiffs' Section 20(a) claim must be dismissed because plaintiffs' Section 10(b) claim fails.  *See id.* at 549 (dismissing a Section 20(a) claim because the necessary predicate Section 10(b) claim had been dismissed).  Defendants are correct with respect to individual defendants MacMillan, Glassell and Guccione.  Because the Section 10(b) claims asserted against them have been dismissed, the derivative Section 20(a) claims asserted against them are dismissed as well.  However, the Court did not dismiss plaintiffs' Section 10(b)

claims asserted against individual defendants Mark and Beshar.  Therefore, the Section 20(a) claims asserted against Mack and Beshar are not dismissed.

Defendants next argue that plaintiffs failed to plead with particularity culpable participation by any of the individual defendants.  However, there is an "overwhelming trend" in this Circuit that plaintiffs need only plead simple control in order to withstand a motion to dismiss for want of particularity.  *Derensis v. Coopers & Lybrand Accountants*, 930 F. Supp. 1003, 1013 (D.N.J. 1996); *see also Rocker Mgmt., LLC v. Lernout & Hauspie Speech Prods.*, No. 00-5965, 2005 U.S. Dist. LEXIS 16854, *42-43 (D.N.J. June 7, 2005).  Further, it has been held that "[the] plaintiff 'need only plead circumstances establishing control because: (1) the facts establishing culpable participation can only be expected to emerge after discovery; and (2) virtually all of the remaining evidence, should it exist, is usually within the defendants' control.'" *Derensis*, 930 F. Supp. at 1013.  Because plaintiffs have adequately alleged control, their Section 20(a) claims against the remaining individual defendants are not dismissed.

### III.  CONCLUSION

In conclusion, this Court grants in part and denies in part defendants' motion to dismiss. The claims asserted against individual defendants MacMillan, Glassell and Guccione are dismissed.  Further, the public statements contained in paragraphs 67, 69, 74, 78, 83, 86, 89 and 90 are not actionable.

**Dated:**  October 27, 2005                    s/ William J. Martini
                                                               **William J. Martini, U.S.D.J.**